Good morning. If it pleases the Court, Counsel, Madam Clerk, my name is Chris Bataille. I represent the appellant in this case, the family of Madeline Liebsack. I would like to apportion my time, 15 minutes for my opening and 5 minutes for rebuttal. Just keep an eye on the clock there because that's the total amount of time you have. Thank you. I'll limit my argument to two issues during this oral argument and the single issue raised by the government in its cross-appeal. The remaining issues that we've submitted on the briefing will remain on the briefing. The first error I would like to address is the district court's finding that Cindy Jones, who is Ms. Liebsack's psychiatric provider, breached the standard of care in the management of her, of Ms. Liebsack's lithium medication. The second error I will address is the district court's finding that Alaska's collateral source rule limits a medical malpractice victim's recovery of past medical expenses to the amount paid by Medicare or Medicaid. I do not intend to review the facts beyond those necessary to address the particular issues. I intend to address my own argument. Mr. Bataille, can you help me on the standard of care? There were 17 experts who testified in this multi-day bench trial, and as I understand it, one of the issues was whether or not a health care provider who orders a lab test has an obligation to follow up on the results of that lab test. Do we really need 17 experts to answer that question in a bench trial before a United States district judge? Not at all. Those experts were primarily called to address the issue of causation. The government's position was that Ms. Liebsack was not lithium toxic at the time in question, that her lithium toxicity developed as a result of other circumstances just before she had her cardiac arrest. But as I understand it, the to make sure that the blood level was tested, which presumably would have shown elevated lithium levels earlier, and perhaps we could have avoided the unfortunate consequences, too. But not at this trial. The issue at this trial, the claims against the mental health organization have been resolved. Well, except the government, I assume, was trying to establish more contributory negligence by the ANP than by the internists. And that turned on who has the obligation to follow up when a test is ordered. And it was Nurse Jones who ordered the test, was it not? Well, actually she wasn't. She recommended that these tests be provided. However, the way it works under the sort of complex interrelationships here, those tests had to be separately approved and granted. I thought the testimony was that she prepared a lab order report and it went to the other facility that actually sent out the test to the lab and that her request got transferred to a lab request form that went to the private laboratory that actually ran the test. Have I got the facts right? Mostly. The difference is that under the way it works in a clinic laboratory is any outside provider such as Nurse Jones who makes a request for lab tests, when they come in, they have to be separately reviewed, authorized, and thereafter transferred to the extent they're authorized and approved by the treating in-house physician, in this case, Dr. Grant. But I thought you said that she was the psychiatric health care provider. Cindy Jones is the psychiatric health provider. Dr. Grant, who actually ordered the test, was... Well, but I mean, that's the issue, isn't it, is who ordered the test? And as I recall, it was Nurse Jones who saw the decedent who was concerned that she might be seeing symptoms of lithium toxicity and she thought that a lab test was in order. Isn't that right? That's right. I mean, she did see the patient, didn't know actually what was going on. Among the tests she ordered was a lithium-level test. Right. So then the question becomes, did she have, for purposes of allocation of fault, an obligation to follow up on that test in order to determine, A, if the test was in fact conducted and, B, what the results show? That was the position taken by the government. But wasn't that the factual issue that the trier of fact, the district judge in this case, had to resolve in order to determine proportionality of fault? If that, yes, except that the government never presented any evidence on the issue of whether or not Cindy Jones reached the standard of care. But I guess that gets back to my first question is, does it really take 17 experts in order to permit the trier of fact to answer the question, does the standard of care require somebody who orders a lab test to follow up to make sure it was done? It only takes one expert. It doesn't take 17, but the problem is that the government never presented an expert on that issue. Well, I guess the problem, and I'm following my colleague's questions, Himes versus Deramis kind of sets forth what we have to have a test for and what we don't, right? The Alaska case, 2005 case, says, claims regarding treatment decisions, prescriptions, and other medical issues that are arguable technical would require expert evidence. Failure to provide medication or adequate access to licensed physicians does not. So what I think we're really struggling with, or at least I'm struggling with, is really does this require expert advice, expert evidence? Because if we frame the question, just follow up on tests that she's ordered, that may not be enough. But if we frame the question bigger than that, then we have to look at Alaska's statute and determine what to do, don't we? Absolutely. Well, I guess that's where my colleague's questions really made a difference to me, which makes me think you better kind of explain. Because I'm having a tough time seeing why this is more than follow up on tests that she ordered, which I don't think would require an expert at all. Okay. Well, first of all, the court, we have a complex interrelationship of providers involved in this process. The actions by Cindy Jones, she had a reasonable basis for the follow up that she did do was reasonable. She explained in her testimony that the symptoms had resolved, that she had sent her over to Dr. Grant to be evaluated, that she had ordered a number of tests that had been taken, and that all of the symptoms that gave rise to the issues had resolved. And so she felt that at that point there was no further need for additional follow up. And so the question is... What number are you talking about, Dr. Grant? This is Dr. Jones. I'm sorry, Dr. Jones, the internist. No. I'm sorry. Psychiatric provider. Jones is the A&P, right? She's the... The nurse practitioner. Psychiatric nurse practitioner. Okay. Right. That's correct. Okay. And so she made the determination that under these circumstances there was no need for additional follow up. And so the question is, under those circumstances is the government required to present a psychiatric expert to say no, she's wrong for these reasons? But that still doesn't address my concern about what do we do with the fact that she had previously ordered the blood test and never bothered to see that it was actually completed. Again, her reasoning was explained. Now, I'm not going to say that an expert could not have come in and said under these circumstances she should have done something more, done something different. The question is, is that something that's subject to expert testimony? I think... But the something is the failure to follow up. You're trying to convert it into what would have happened if the blood test had come back with a high score. But then from that point on, I can't get to that point until I resolve the primary issue of the obligation to follow up on the test. And I'm having the same problem that Judge Smith is having. Why do we need an expert to say that if a healthcare practitioner orders a test, he or she has an obligation to follow up and make sure that it was done and see what the result was? Because under these circumstances, she understood that the test had been done, and that Dr. Grant, who at that point had ordered the test, had presumably reviewed those tests. You keep saying Dr. Grant had ordered the test, but Dr. Grant said, no, I don't monitor lithium levels. That's not what I do as a generalist. That's right. That was her testimony. She doesn't monitor lithium levels, but she was the intermediate person who was evaluating Cindy Jones, or excuse me, Madeline Levesack, with respect to these concerns about what was going on that prompted these tests, including the lithium level. But when you say concerns, that gets back to the problem of there wasn't any communication from Nurse Jones to Dr. Grant to tell her what her concerns were. Actually, the way that it worked under these circumstances is that Madeline Levesack came to Cindy Jones with her assisted living provider. The assisted living provider is there because he's essentially the person transferring that information. But he didn't accompany her to the internist. That was the ruling by the court. Is that fact contested? I mean, either there was somebody there or there was not. Well, he testified that he was present. He's always present at those meetings. With Dr. Grant? With Dr. Grant. But the court ruled, based on its evaluation evidence, that... Of the facts. Of the facts. So don't we have to find that fact clearly erroneous before we can assume that he was, in fact, present? Well, whether he was present or not, we're looking at the conduct of Cindy Jones. And Cindy Jones is under the understanding that, because this is the way it normally works, that that information, the information about why Madeline Levesack was referred to Dr. Grant was communicated by the assisted living provider. Let me step back just one step and maybe approach it from a different angle. You said earlier that there was no testimony on the standard of care, right? Correct. On this conduct. Now, by that you mean there was no testimony that you deem acceptable or none at all? Well, there's two aspects of it. One is there was never a psychiatric expert who had the necessary qualifications under Alaska law to evaluate the conduct of... Of the nurse. Of Cindy Jones. Okay. And the government, you have to understand that the government realized that it did not have such an expert at a point so late in the proceedings that ultimately the court said you can't have that expert. And as a consequence, we certainly had no opportunity at that point to hire an expert who could address that issue. And I think the court, the question of whether or not... Well, let me ask you a related question. State now as precisely as you can what the standard of care issue is. That what? Whether or not what? What's the standard of care that applies here, in other words? Well, the standard of care question that needed to be addressed by an expert is, first under Alaska law, what is the standard of care that exists under the circumstances existing at the time at issue? For what? For the actions of Cindy Jones. What actions of Cindy Jones? Well, the conduct or omissions of Cindy Jones. What was she required to do under these circumstances? To follow up on the test? Is that all? Right. I mean, what was the... I mean, is it follow up on the test? Because the government seems to suggest that the best issue it is is whether she followed up on the test that she ordered. Now, I have a tough time suggesting an expert is necessary for following up on tests. Well, that's my question, too. If that's the issue on the standard of care, why do you need psychiatric expert testimony? Because under the circumstances here where Cindy Jones says, under these circumstances, this is the way it works. I mean, at that point, that test was no longer relevant to me. It was no longer relevant. Is that or is it across the field of medicine, whenever any health care practitioner orders a test, the standard is that you follow up on that test and find out what the results were? Well, the question is what... That's not confined to the specialty of psychiatry, is it? Well, it may or may not be. But in order for an expert to say that under these circumstances, that general nonspecific duty applies to Cindy Jones, doesn't meet the requirements of either Alaska law or, frankly, Rule 702. Well, the problem that I have is Nurse Jones didn't testify the standard of care. Dr. Curtis didn't. He provided lay testimony. Dr. Simono wasn't licensed as a nurse practitioner. Dr. Kahn is the same as Simono. And I may have just killed those names because I'm just from Idaho, so I'm just saying them the way they come across. But if I look at Dr. Simono's testimony, it seems to me that what he said could address the general duty of following up on tests that someone should have ordered. I mean, if you look at his testimony directly, it definitely addressed that. So if it's a general duty we're talking about here rather than a psychiatric duty, I think you lose. But it has to be applied to somebody in the psychiatric field. I mean, she never taught it. As I understand both Rule 702 and our court's rules, if you take a general nonspecific duty that all doctors must do X, you then have to explain, A, what's the basis for that finding. You can say, well, it's my experience as a general practitioner, so therefore I think all experts, all specialties must do that. And then in addition, though, you have to be able to tie that general duty to these particular circumstances under this particular situation. And Cindy Jones did testify. But if it applies to all health care practitioners across all disciplines, what more do you need? Well, there has to be, as I understand it, under our rules, you can't just say this is something that I think as a family practice doctor, not as a psychiatrist, is required by all doctors. You have to use blue pens in order to distinguish. But you're focusing on what I'll call step two, which is a test is conducted, it comes back with a high lithium toxicity level. Now what does a trained psychiatric health care practitioner do, coupled with the other symptoms with which she presented earlier? And I believe there was testimony, I think from your expert, that there was a direct causal relationship that that toxicity level must have been elevated in order to trigger the cardiac event down the road, right? And we're focused on step one. And maybe we're just beating a dead horse here, but I'm still trying to understand why you would need an expert on the general principle of following up on tests. If the court had made the ruling that expert testimony is not necessary to determine whether Cindy Jones breached the standard of care, which is a ruling it actually made with respect to Lakeview, then we would be looking, I suppose, at the issue of whether or not expert testimony is needed at all, or if it can be just general testimony by somebody who's not qualified to testify regarding the psychiatric standard of care. But the district court heard lots of testimony from health care practitioners. But not on that issue. Well, I mean, Dr. Simono comes pretty darn close. Dr. Simono says, in my opinion, every doctor has a duty to follow up on tests. She didn't specify what that follow-up was. She didn't tie it to the facts and circumstances. And you've got to get past step one with me, or else... Right, but follow-up, I mean, simply saying that you have to follow-up without defining what that means and what does it mean in this circumstance is essentially meaningless. It doesn't meet the requirements of our statute that says we're not going to hold doctors liable simply by coming up with a generalized, non-specific standard of care that by inference we're applying to this doctor. Well, the problem comes, I guess, looking at your law. I look at Kendall v. State Division of Corrections. The primary limitation of the rule that you've got to have expert testimony is when it's a non-technical situation where negligence is evident to lay people. Then Himes says, claims relating to treatment decisions, prescriptions, or other medical issues that are technical require expert evidence, but failure to provide that medication or adequate access to licensed physicians does not. And it seems to me I'm right there. I'm right there trying to make these determinations. And I'm saying to myself, follow-up on tests that somebody has offered. And I can say that there's expert testimony in this proceeding to suggest you should follow-up. It doesn't say what you should do about it, which I would say is a little bit beyond where they can go, but at least follow-up. And it seems to me those are our questions we're really after you about today. But that's the problem, and I'm having a tough time understanding. Well, I think from what you're saying is that everybody is assuming that what follow-up means is to do something different than what Cindy Jones did. She didn't do anything. That's the problem. If the standard of care is that you've got to follow-up and she didn't, then she breached the standard of care at step one. But by follow-up you're assuming that that... Well, follow-up is just seeing that something, that a test was performed. See that there's something to look at, not make any decision based on it. Well, there were tests that, in addition to the lithium-level test that was done, and they also address, and this was what the subject of all these experts was, they also addressed whether or not they were suggesting lithium toxicity. The position of the government was that, and all their experts, was the same as Cindy Jones, which is that under these circumstances you don't need to do anything more than she did because they indicate that she is not lithium toxic. And so all these experts are essentially saying, the government's own experts on causation are saying she really didn't need to do anything more because there was no indication at that point that a problem existed. And so it basically emasculates, I think, our rules to allow an expert in a specialty that is not the same as that of the person at issue, the defendant at issue, to come in and say, well, just generally speaking, I think all doctors have to do something in general. But isn't that a legal question for the trier to decide? In other words, is this an area where an expert in psychiatry is necessary? Yes, and the government conceded when it sought to add a psychiatric expert that in order to prove allocation and in order to prove the negligence of Cindy Jones, it had to have a psychiatric expert. Well, let's hear from the government. You've used up all of your time. I will give you a couple of minutes on rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. Daniel Lenners for the United States. The government agrees with the Court that the negligence issue with regard to Nurse Jones needn't be proven by expert testimony and for failure to follow up. Well, if that's the case, why did you ask the district court for leave? To supplement your Rule 26 and add a psychiatrist. There are other ways in which Nurse Jones could have been negligent that could have been established by expert testimony. For example, there was testimony in the record by Dr. Curtis that when she was a doctor treating a patient who took lithium, she made sure to test their blood lithium levels every six months to be sure that they weren't becoming elevated. In this case, Nurse Jones hadn't tested Ms. Leibsack's blood lithium levels for eight months or nine months by the time November rolled around and Ms. Leibsack had the heart attack. I thought Dr. Curtis testified to that. Dr. Curtis, as a lay witness, testified that that's her best practice as a treating physician. This is something that could have also been established by a government expert in psychiatry. However, the question of whether Nurse Jones, having ordered a blood lithium test, had some sort of duty to make sure that test was completed, to follow up on that test, to contact Dr. Grant, this isn't the kind of technical medical knowledge that needs to be proven by expert testimony. And even if it did, the Alaska Rule that plaintiff argues is applicable here, and the government doesn't agree that it actually applies in these circumstances, makes clear that an expert may testify if they are trained and experienced in an area directly related to the matter at issue. And the doctors who testified here testified that this duty to follow up on tests goes across the board to all medical providers. So I think plaintiff is too narrowly defining the type of expert to be a psychiatric expert, when in fact you just need a doctor to say that this is the kind of duty that applies to all medical providers. Well, the thing that worries me just a little bit with that argument, and I guess I'm back to these cases, Himes and Kendall, is that it seems to me that the crux of the negligence claim was that Nurse Jones breached the standard of care for psychiatric treatment of a patient with those symptoms. Now, even the district court didn't limit its ruling to simple follow-up. The district court instead discussed several shortcomings in Nurse Jones' conduct. So how can I suggest that it's mere follow-up? And how can I suggest that what was given, because I guess you'll agree with me, Nurse Jones didn't testify to the standard of care, correct? That's right, Your Honor. And Dr. Curtis, the government says, provided only lay testimony. That's correct, Your Honor. And Dr. Simoneau wasn't licensed as a nurse practitioner, correct? Dr. Simoneau was a licensed general practitioner. But he wasn't a nurse practitioner? She's not a nurse practitioner. Oh, sorry. And Dr. Kahn is the same as Dr. Simoneau, correct? That's correct, Your Honor. So if we don't have this expert, which you tried to get, and if, in fact, we're really talking about the standard of care for psychiatric treatment, and we're not just talking merely about follow-up, but all of the shortcomings that the district court talked about, then I've got a rule for the other side, haven't I? Well, I disagree, Your Honor, for two reasons. One, it's not about the psychiatric treatment standard of care. Nurse Jones is the one who evaluated Ms. Levesack and determined that one possible explanation... Nurse Jones' decision when she saw Ms. Levesack on October 11th to test for lithium toxicity. No one's questioning her judgment that that's one possible explanation for Ms. Levesack's symptoms. All they are saying is once she made that judgment and once she ordered that test, she had a duty to make sure that she saw the results of the test or that she contacted Dr. Simoneau. But that's how you want to narrowly focus it. But look at ER 12. ER 12 is where the district court suggests what the district court believes is the psychiatric treatment of a patient with these symptoms. And that doesn't deal with just follow-up. If you read all of what's there on page 12 of the district court's record, I mean, I can read it all to you, but that's not all. It's just not about follow-up, and that's why I'm worried that this is more than follow-up, that this is treatment. I think it's fair to read the district court's opinion on page 12 as focusing on follow-up. It talks about the concerns on Nurse Jones' part that led Nurse Jones to order a blood test and included a request that a lithium level be taken. Nurse Jones did not refer Madeline to Dr. Grant to evaluate Madeline's lithium level. She did refer her to Dr. Grant to see if Madeline might be having difficulties unrelated to her psychiatric medications. Nurse Jones, however, failed to follow up on the laboratory request, failed to seek further testing, and failed to contact Dr. Grant regarding her concerns. Okay, so there we got it. Failed to follow up, that's your idea. Failed to seek further testing, that's not your idea. Failed to contact Dr. Grant regarding her concerns, that's not your idea. All of that suggests to me we've got to have more than just a general practitioner, if you will, coming in saying what it is that the nurse did wrong. Your Honor, I think the fairest reading of that sentence is there are all types of follow-up. Nurse Jones failed to follow up on the laboratory request to make sure that the test was done. She failed to seek further testing. At some point, the lab results were provided to Nurse Jones. Well, then what are you going to do? Moreover, it had been over eight months since Madeline's last test, far longer than appropriate for one in Madeline's condition. You know, that factual finding was supported by Dr. Curtis' testimony that when she was... Well, Dr. Curtis, again, is not an expert. That's correct, Your Honor, but Dr. Curtis was the person who was a psychiatrist who oversaw people like Nurse Jones. In fact, was Nurse Jones' supervisor at the time in question, and testified that best practices were to follow... But, again, Dr. Curtis does not give expert testimony. The judge has to have expert testimony to make those findings. Can't make it on a laid testimony. And he goes on to say, furthermore, testing should have been more frequent. Had Nurse Jones done any of these, much of the uncertainty regarding the condition would likely have been resolved. Your Honor, fundamentally, I disagree that this Alaska statute even applies in this case. I think if it does, that it is apparent on its face that Nurse Jones' failure to follow up after she ordered a test need not be proven by expert testimony or can be proven by expert testimony because it relates to the matter at issue, not direct psychiatric expert testimony, but the kind of general testimony that Dr. Simoneau provided and that plaintiff's expert provided. Well, but without expert testimony, is there evidence on the standard of care that applies to Nurse Jones? There is expert testimony, all of which is admissible under federal law. The state statute is the kind of procedural statute that doesn't apply in federal court. Doesn't it supply the rule of decision under Rule 601? Your Honor, 601 says that state statutes regarding the competency of witnesses to testify shall apply in this kind of case. And we're talking about establishing the competency of an expert in a medical malpractice action to offer an opinion on the standard of care, are we not? This is about the qualifications of an expert under Rule 702, Your Honor. The few cases that apply, these kind of... Counsel, be careful, because I think the cases draw a distinction between establishing the, I'll call it the bona fides of an expert, and whether or not under state law that expert is legally permitted to testify and offer an opinion. I agree with you that under Rule 701 and 702, the district court still has a Daubert gatekeeping function to determine whether the proffered expert is in fact an expert in psychiatry and qualified to offer an opinion on the standard of care. But before you get to that step, you've got to get past the Alaska statute, which is not unique to Alaska, that essentially says who is legally qualified to appear in a malpractice action. I disagree that this kind of statute applies per Rule 601. If you look at the few court decisions that do apply these kind of state statutes in federal proceedings, they all explicitly talk about the competency of expert witnesses. Well, but just a minute, if you're going to argue that, how are you going to get by Jordan? A direct case in our court, 2005, about an Oregon statute, similar type case, and we said, pursuant to 601, we're required to follow Oregon law. I'm not familiar with the Jordan case, Your Honor. The cases that plaintiff has cited, which are long out of the, excuse me. What about Trevino? What about Trevino? Trevino talks about... This is a diversity case. They give the district court broad discretion to determine the competency of expert witnesses. But I guess I'm trying, when I look at these cases, and I look at Jackson, we've got Jackson, the 1989 case. All of those cases lead me to the conclusion that, pursuant to 601, we've got to enact an Oregon locality rule in these particular situations to put an expert together. Your Honor, Trevino speaks to Washington's law about the competence of experts. McDowell v. Brown, the 11th Circuit case, the Georgia rule at issue in that statute expressly addresses expert competence. Legge v. Chopra, the 6th Circuit case that plaintiff cite, the Tennessee rule there expressly talks about expert competence. Here there are separate Alaska rules that talk about the competence of witness. This rule at issue, this Alaska 920-185, talks about the qualifications of experts to testify. That's not about competence, that's about admissibility, which is governed here by Rule 702. But you don't get to 702 until you get past 601. That's the problem I'm having with your argument. But 601 incorporates a limited number of state rules that discuss competency of witnesses. It's talking about whether children are competent to testify or whether jurors are competent to testify. Right, and in this case it requires a licensed medical practitioner who is licensed in some state in the particular field in which he's being proffered as an expert. But the district court still has the obligation under 701 and 702, even if he is technically licensed and qualified as an expert psychiatrist, to determine whether the basis of his opinion meets the Daubert gatekeeping factors, right? I agree that the district court regardless has a duty under 702 to apply Daubert. But we never get there if he doesn't qualify under 601. I disagree that Rule 601 incorporates this Alaska statute. I mean, I'm back to what do we do with Jordan? Do we just ignore it and say, well, that was one of those breakaway Ninth Circuit panels. Off on a frolic. We couldn't get there. Even though we might think it's a breakaway panel, I don't remember even who wrote it. But we couldn't get there. I mean, the bottom line is, it seems to me that your practical argument about this is, if you want to get rid of the Alaska statutes about the qualifications of expert, take your case to federal court. Everybody else is going to apply them, but if you don't want to do it, go to federal court. And Alaska is not the only one writing these kinds of statutes, which say what experts ought to do. Old Idaho, from which I come, has written in theirs, you've got to know what the local standard of care is. So we get rid of all the experts that aren't from Idaho. I mean, these are tough issues, but it seems unusual that you could go to federal court and just throw them out the door. Well, it's unusual that a procedural statute like this would apply in federal court. Well, it's that pesky, eerie doctrine, but we're sort of stuck with that. That's right. Substance applies in federal court, but not procedure, Your Honor. But in this case, the substance is who is legally qualified to be endorsed as an expert. And we first have to look to state law. I don't agree that that's substance, Your Honor. Even if you do look to Alaska state law, however, Dr. Simono was qualified to testify as an expert about the matter at issue, which was Nurse Jones' duty to follow up on tests she decided were medically necessary. And even if you don't think that Dr. Simono was properly qualified under this Alaska statute, I agree that this is the kind of non-technical issue that need not be proven by expert testimony. If I could move on to the government's cross-appeal, Your Honor. The government did appeal on the issue of the district court's determination of how much of Ms. Leapsack's medical bills in the future can be attributed to her preexisting medical conditions. The government offered expert testimony establishing that Ms. Leapsack had spent much of the four years prior to her heart attack in hospitals and in assisted care facilities because of issues she had with her tracheostomy. She was constantly putting objects in it, pulling it out. I believe the testimony was that three years prior to her heart attack, she had spent every single day in a hospital or a psychiatric institution. Two years prior, she had spent almost the entire year in hospitals and in similar institutions. And the year prior to her heart attack, she spent 120 days in hospitals and other institutions related to care for her tracheostomy. The government calculated the amount of her medical bills that could be attributed to that sort of preexisting condition and found that it was $420,000. The district court, in a not particularly well-explained opinion, picked a number that it found was admittedly speculative and just chose a number, $42,000, of Ms. Leapsack's medical bills that it found was attributable to her preexisting conditions. Didn't Ms. Leapsack's long-term care expert say, well, it was only $4,000? So the finder of fact had to choose between $420,000 and $4,000, and it picked, what, 10%? It picked 10% of the government's number, a number that's much closer to what Ms. Leapsack's long-term care expert. But Ms. Leapsack's long-term care, Ms. Leapsack presented no sort of expert testimony by which the district court could determine, as a matter of fact, which expert was right. Ms. Leapsack never presented any testimony by a doctor to say, no, she won't have these recurring hospitalizations and other incidents that will require extremely, or that will lead to extremely high medical bills. The district court, or the government, by comparison, did present expert medical testimony that these sort of incidents would recur and could be expected to recur. And the district court didn't, in its opinion, explain that it found that it was rejecting that testimony or give any reason why it would find that Ms. Leapsack's expert testimony was more plausible. What is my standard of review on that particular issue? Isn't it clear, Er? I mean, I've got a court who's listening to the testimony. I've got a court who's heard everything that's been said. I've got a court that's listening through. You presented these same arguments to the court. I read the testimony. You made the same arguments. It seems to me that at that point, the district court's heard your arguments. They've had the treating physician come in here and talk about the long history of significant health problems and go through all of this long history and what she had to do. And at that point, I've got to suggest that the district court's calculation on a clear error standard is out to lunch. Your Honor, I think there's no actual factual testimony underlying the district court's determination. What about all that stuff that the treating physician put in the record? I mean, the treating physician talked about a long history of significant health problems. In fact, I can talk to you about all of what those are, but I don't think that's necessary. I think, Your Honor, the district court didn't discuss any of that in its opinion. At the very least, Rule 52 requires the district court to explain its findings of fact and how it calculates damages. That's what this court said in Crockett and Myers. The Seventh Circuit decision that we cited in our brief says the same thing. The district court simply said, well, this number is admittedly speculative, but it's more likely than the government's figure, and so I'm going to choose it. And at the very least, if this court doesn't want to reverse the district court, it should send it back for a clearer explanation as required by Rule 52. If the court has no further questions. I think not. Thank you. Mr. Bakai, I'll give you two minutes. If you would address the government's cross-appeal, that would be helpful. Thank you, Your Honor. The main reason that number was so high is because the government's accountant ignored the testimony of the government's own life care planner that the basis for determining the amount that it would cost to treat those preexisting conditions should be based on her condition after she was incapacitated by the cardiac arrest. And so, for example, for the last year and a half, and I'm not sure where he was getting his numbers on the history here, but for the last year and a half before she had her cardiac arrest, she was in an assisted living home, but she was caring for her tracheostomy herself at very little expense. Once she became incapacitated by the heart attack caused by the negligence here, she then had to have somebody else take care of that tracheostomy in a hospital at a huge expense, because they had to do it every day. The government is saying that that cost is the cost that the court should use to deduct from its future medical expenses. Their own expert said that's not the proper methodology, but the accountant, presumably at the instructions of somebody else, computed it on that basis. So I just think that's all I need to say about that. If I can, I'd like to address the point about the competency of experts, because clearly under your precedent and under 601, the court must determine as a threshold matter whether that witness meets the qualifications, the competency to testify as an expert, and there's no dispute here that at least in the field of psychiatric care, Dr. Simonow did not meet that requirement. She had to be certified in a specialty that recognizes that the area of that specialty addresses the issues in the case and the qualifications of the defendant who's being alleged to have been negligent. And I would also just quote from the notes, from Rule 702's commentary, that says that if a witness is solely or primarily relying on experience for their testimony, which is the case here, Dr. Simonow is saying, well, I've been a family doctor and so all doctors should do X. Assuming that she meets the threshold requirement for competency, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it. The government could have called an expert, and if the government had had an expert, a psychiatric expert, to say this provider did not do what she should have done under these circumstances, we would have provided an expert to address that. We had no opportunity to do that. The bottom line is the government's failure to appoint an expert that they recognize they needed to establish the standard of care against Cindy Joan is going to benefit them because they've been able to introduce testimony backdoor from people who are not qualified and who are not competent to prevent the plaintiff from essentially rebutting those decisions. Thank you, counsel. Your time has expired.
judges: Tashima, Tallman, Smith